**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHELLE OZAN, | ) | CASE NO. 1:23-cv-02441 |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE DAVID A. RUIZ |
| v. | ) | |
| | ) | |
| TOAST, INC., | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| | ) | |
| Defendant. | ) | |

## I. Procedural History

Plaintiff Michelle Ozan filed a complaint against her former employer Toast, Inc. alleging the following cause of action: (1) disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12112(a) and Ohio Revised Code § 4112. (R. 1). Defendant filed a motion for summary judgment (R. 18). Generally, Defendant argues that Plaintiff was neither disabled nor regarded as disabled; that there is no evidence that she was terminated due to any alleged disability; and that Defendant was terminated for misconduct after an investigation by individuals who were unaware of her alleged disability. *Id*. Plaintiff filed a brief opposing the motion (R. 24), while Defendant filed a reply in support of its motion. (R. 25).

## II. Summary of Key Facts[1]

### A. Defendant Toast's Operations and Policies

Defendant Toast operates a restaurant management software system that is designed to assist restaurant owners with all operations, including *inter alia* payroll, inventory management, scheduling. (R. 20-1, PageID# 320; Depo. of Lindsey Schidlovsky Tr. at 12-13).[2]

Toast hired Plaintiff in March of 2019, as an Account Executive working remotely from Cleveland, Ohio. (R. 21-1, PageID# 378, Ozan Depo. Tr. at 36, Exh. 3, PageID# 483). To her knowledge, a majority of the other sales team employees also worked remotely. (R. 21-1, PageID# 378, Ozan Depo. Tr. at 36).

According to its employee handbook (the "Toast Recipe Book"), Toast offers its employees flexible Paid Time Off ("PTO") to give employees time to "rest, recharge, and enjoy themselves outside of work," as well as flexible sick leave. (R. 21-1, PageID# 478, Ozan Depo. Exh. 2). In addition, employees are eligible for "20 Weeks of Medical Leave - taken consecutively or intermittently." *Id*. On September 29, 2021, Plaintiff represented that she reviewed and understood the Toast Recipe Book. (R. 21-1, PageID# 483, Ozan Depo. Exh. 3). Plaintiff further testified that she understood that Toast "didn't have a specific limit on PTO, that they were flexible on PTO." (R. 21-1, PageID# 379, Ozan Depo. Tr. at 39). Plaintiff also acknowledged that she knew paid medical leave was available at Toast. *Id*. at Tr. 40. Plaintiff occasionally took PTO, but never requested any leave and, therefore, was never denied leave. *Id*. at Tr. 41-42.

On September 29, 2021, Plaintiff confirmed that she had read, understood, and agreed to

[1] The Court's recitation of the facts is not intended to be exhaustive.
[2] Schidlovsky is a regional vice president of Toast.

comply with Toast's Code of Conduct. (R. 21-1, PageID# 483, Exh. 3 to Ozan Depo.) Her signature statement also indicates that "[she] understand[s] and agree[s] that I will be subject to sanctions, including termination of employment, that may be imposed by the Company, in its sole discretion, for violation of the Code of Business Conduct and Ethics." *Id*. The Code states that "Employees, officers and directors must honestly and accurately report all business transactions. You are responsible for the accuracy of your records and reports." (R. 21-1, PageID# 488, Ozan Depo. Exh. 4).

**B. Plaintiff's Injury and Lack of Restrictions**

On August 5, 2022, while visiting family in Connecticut, Plaintiff was sitting in her car at a traffic light when she was struck by another vehicle. (R. 21-1, PageID# 384, Ozan Depo. Tr. at 60-61). Plaintiff immediately drove herself to the emergency room to be examined, but was not kept overnight. *Id*. at Tr. 62-63. She testified that she immediately had "pretty severe back pain" and could not move her neck. *Id*.

Through her entire span of employment with Toast, Plaintiff always reported to District Manager Drew Winick, who also worked remotely. (R. 21-1, PageID# 378, Ozan Depo. Tr. at 35-36). Plaintiff informed Winick of the accident the following day. (R. 21-1, PageID# 387, Ozan Depo. Tr. at 71-72; R. 19-1, PageID# 315, Exh. 30 to Winick Depo.) Plaintiff testified that Winick was supportive and he asked Plaintiff if she needed anything. *Id*. Winick testified that he offered Plaintiff the ability to take time off, but she refused. (R. 19-1, PageID# 263, Winick Depo. Tr. at 24-25). He further stated that Plaintiff never requested "any changes to her duties, changes to scheduling, changes to equipment, changes to any terms or conditions of her employment … relative to any health concerns." (*Id*.; *see also* R. 21-1, PageID# 379, Ozan Depo. Tr. at 42). Plaintiff testified that she continued working after her accident and was able to

schedule doctors' appointments without issue, as her work for Toast was not a "9 to 5" job. (R. 21-1, PageID# 387, Ozan Depo. Tr. at 70-71).[3] Though Plaintiff declined Winick's offer to take leave if she needed it, Plaintiff opted to used PTO just one month later in September of 2022 to go on a four-day hiking trip in the mountains of Washington, a fact she shared with Winick. (R. 21-1, PageID# 397, Ozan Depo. Tr. at 112). Plaintiff further testified that she continued to travel after her accident, including going on a cruise in Florida, and exercised at the gym. (R. 21-1, PageID# 392, 398, Ozan Depo. Tr. at 90-91, 114).[4]

Plaintiff did not tell anyone else at Toast about her accident other than Winick until several months later, when she told Lindsey Schidlovsky, the Regional Vice President of Sales, in person at a company event in January 2023. (R. 21-1, PageID# 387, Ozan Depo. Tr. at 72-74). Plaintiff mentioned to Schidlovsky that she might need surgery in the future. *Id*. Plaintiff concedes that Schidlovsky offered Plaintiff the ability to take leave, but she declined the offer because she wanted to continue to earn commissions. (R. 21-1, PageID# 388, 395-96, Ozan Depo. Tr. at 74-75, 106-106). It is undisputed that Plaintiff would have continued to receive her base salary and health insurance while taking leave. *Id*. at PageID# 392, Tr. 92-93.

When asked if she requested any specific help, Plaintiff testified that she asked both Winick and Schidlovsky for a sit/stand desk. *Id*. at PageID# 388, Tr. 74-75. Plaintiff testified that Schidlovsky's response was to speak with Winick. *Id*. She said that Winick stated he would look into it, but that nothing happened. *Id*. at Tr. 77. Afterwards, Plaintiff suggested that a sit/stand desk be added as a prize on the company's "prize wheel," to which Winick responded the prizes

[3] Plaintiff testified that she was diagnosed with disc herniations, spinal stenosis, and a pinched nerve several months after her accident. (R. 21-1, PageID# 386, Ozan Depo. Tr. at 66).
[4] Plaintiff did report that she used the treadmill at the gym, but before the accident, she would use weights as well. (R. 21-1, PageID# 392, Ozan Depo. Tr. at 90-91).

had already been chosen for the contest. *Id*. at Tr. 75. During his deposition, Winick testified that remote employees receive a stipend up to $1,000 to purchase home-office equipment necessary for employees to perform their job duties, and that "if she truly did need a desk, she could have used it for that purpose as well." (R. 19-1, PageID# 264, Winick Depo. Tr. at 28-29). Plaintiff did not "recall ever using any money from a stipend to buy any home office equipment." (R. 21-1, PageID# 395, Ozan Depo. Tr. at 102-104). Plaintiff further testified that she did not contact Human Resources about a desk. *Id*. at Tr. 79. Plaintiff further testified that none of the physicians she saw post-accident assigned her any work restrictions, but they gave her recommendations such as limiting her time in the car, using a sit/stand desk, and limiting the weight she should carry. (R. 21-1, PageID# 390, Ozan Depo. Tr. at 85). Plaintiff also concedes that she never submitted any written instructions from any medical provider to Toast concerning any work-related restrictions. *Id*. at Tr. 85-86. Schidlovsky testified that no accommodations were ever requested from Toast. (R. 20-1, PageID# 321, Schidlovsky Depo. Tr. at 15).

In January of 2023, Plaintiff requested that Winick move her from an overflow hotel to the main hotel for a company event to minimize walking due to Plaintiff's neck pain. (R. 19-1, PageID# 267, Winick Tr. at 39-40; Exh. 21, PageID# 307). Winick indicated this was the first he heard that Plaintiff was having a problem in terms of daily activities like walking. *Id*. He directed Plaintiff to contact the Toast employee responsible for scheduling the conference, and indicated that "I do know that they made the accommodation to move her again." *Id*. Plaintiff admits that Toast accommodated her request and moved her to the closer hotel. (R. 21-1, PageID# 395, 408, Ozan Depo. Tr. at 105, 156).

**D. Investigation into Complaints of Misconduct**

On March 2, 2023, Laurel Pilch ("Pilch"), an Account Executive like Plaintiff, contacted

Schidlovsky to report concerns about the manner in which Plaintiff had reported and handled agreements with a multi-unit customer, Chicken Ranch. (R. 20-1, PageID# 322, Schidlovsky Depo. Tr. at 20-21; R. 18-5, PageID# 244-45, Exh. E).[5] According to Schidlovsky, Plaintiff had sold the Toast system to Chicken Ranch for one of its locations but had recorded in Defendant's software that the customer had agreed to purchase Toast software for two additional locations, causing the customer to become upset. *Id*. The customer wrote an email to Pilch in January of 2023 stating as follows:

> Those items were completed falsely under original chicken ranch because I didn't know there were two locations created...
>
> I have had support remove two other locations that are not committed to toast in order for me to correct menu items for the only restaurant that is signed up for toast...
>
> Zina is the only restaurant that has committed and signed up and has everything up and running for toast... I do not want any other locations listed on the back end for editing...

(R. 18-2, PageID# 245, Exh. E).

After learning of the issue from Pilch, Schidlovsky was contacted by Alexa Armata Boucher ("Armata") in human resources that an anonymous complaint was made in AllVoices[6] on March 16, 2023, concerning a different customer group. (R. 20-1, PageID# 322-23, Schidlovsky Depo. Tr. at 21-22; R. 23-1, PageID# 684, Armata Depo. Tr. at 31-33; *see also* R. 22-1, PageID# 625, Patton Depo. Tr. at 12; R. 22-1, PageID# 663 TOAST000014). The anonymous complaint alleged "Michelle Ozan is creating fraudulent accounts at the end of the

---

[5] Pilch took over the Chicken Ranch account, which had been Plaintiff's customer, because the restaurants were located within Pilch's assigned territory. (R. 18-5, PageID# 244-45, Exh. E).
[6] AllVoices its Toast's reporting platform that allows employees to anonymously raise concerns to management regarding discrimination, bullying, fraud, misconduct, etc. (R. 21-1, PageID# 490, Exh. 2).

month (look at existing restaurants labeled as new restaurants to have the CSD extended & doing late night in person signings). A customer called in to report & nothing was done. She has a large MUO that she recently did late night, end of month, in person signings listed all 11 accounts ….” (R. 22-1, PageID# 633).

Thus, in March of 2023, Defendant initiated an investigation into Plaintiff's conduct. (R. 20-1, PageID# 322-23, Schidlovsky Depo. Tr. at 21-23; ; R. 22-1, PageID# 625, Depo. of Patton Tr. at 12-13). Robin Patton ("Patton"), Senior Director of Employee Relations, reviewed the anonymous report, and in consultation with Armata, Toast's legal team, and Patton's manager Mike Gutner, they elected to conduct an investigation. (R. 22-1, PageID# 626, Patton Depo. Tr. at 14-17). As part of the investigation, Armata pulled data concerning Plaintiff's customer signings. (R. 23-1, PageID# 680, Armata Depo. Tr. at 16-17).

Schidlovsky described the process of "in-person signing" as "exactly what it sounds like. It indicates that you're in person, and the restaurant owner/operator – whoever's executing the agreement on behalf of the restaurant -- they are the ones executing it, but you were there in person with them." (R. 20-1, PageID# 323, Schidlovsky Depo. Tr. at 25). Winick described "In-person signing [as] a feature within DocuSign that allows you to essentially turn the computer facing the customer and have them actually go through the agreement and sign directly using your computer digitally." (R. 19-1, PageID# 262, Winick Depo. Tr. at 21). In December of 2022, Toast announced it was phasing out in-person signing, and the practice was "formally removed" in February of 2023. (R. 20-1, PageID# 323, Schidlovsky Depo. Tr. at 27). Schidlovsky indicated that after that date, in-person signing was considered a "non-compliant process." *Id.*[7]

[7] Winick sent a follow up email to Plaintiff on March 14, 2023, "to remind [her] about in-person signings from our Breadbox training + compliance in February. Until systems can block this

When deals were completed using in-person signing, Toast employees were required to input the restaurant owner's email address, as once the contract was signed, the Salesforce software automatically sent a copy of the signed contract to the customer confirming the agreement. (R. 21-1, PageID# 394-95, Ozan Depo. Tr. at 101-102). The procedure was not replaced with a new procedure, as the "traditional manner" to complete agreements remained, which involved the restaurant owner/operator receiving the agreement via email, which he or she would then sign via DocuSign. (R. 20-1, PageID# 323, Schidlovsky Depo. Tr. at 27-28). Plaintiff completed DocuSign training on January 20, 2023. (R. 21-1, PageID# 393, Ozan Depo. Tr. at 97). She asserts the change did not go into effect until after her job ended with Toast. (R. 21-1, PageID# 393, Ozan Depo. Tr. at 95-97).

As part of the investigation, Schidlovsky directly contacted the affected customers to ascertain whether they had, in fact, signed the agreements in question. (R. 23-1, PageID# 680, Armata Depo. Tr. at 17). Two customers, one with multiple locations, confirmed to Toast that they had not executed the agreements, and did not intend to sign deals with Toast, at least not for more than one location. (*Id*. Tr. at 17-20; R. 20-1, PageID# 325, Schidlovsky Depo. Tr. at 33). Schidlovsky and Winick testified that they pulled data from Salesforce relative to the customer email addresses attached to the disputed sales. (R. 23-1, PageID# 680, Armata Depo. Tr. at 17; R. 19-1, PageID# 262, Winick Depo. Tr. at 30-33). Winick testified that he found several variations of incorrect email addresses for several deals, including the affected customers. (R. 19-1, PageID# 262, Winick Depo. Tr. at 30-33; R. 19-1, PageID# 294, Winick Depo. Exh. 4). Patton testified that Plaintiff "used e-mails that were not the e-mail of the customer, because if

---

from happening, please avoid using your Toasttab email for signing purposes; this must come directly from the customer's email address." (R. 19-1, PageID# 293, Winick Depo. Exh. 1).

she used the customer's e-mail, then, they would receive a copy of the document and it would become clear to them that she had signed on their behalf. So she input other e-mails. I don't recall what those e-mails were, but she admitted to inputting incorrect e-mails, in order to avoid that processes." (R. 22-1, PageID# 629, Patton Depo. Tr. at 27).

Plaintiff was unhappy with the end of in-person signing, sending a message to Winick on January 10, 2023, which read: "Wish in-person signing didn't go out. Chasing DocuSigns again might cripple me. If you think of a workaround outside of having them forwarded to me, please let me know." (R. 21-1, PageID# 399, Ozan Depo. Tr. at 118; Exh. 16 to Ozan Depo. at PageID# 525). Plaintiff testified that the traditional DocuSign procedure slowed things down, because it required her to physically go meet customers who were having difficulty completing the form and walk them through completing all the required fields. (R. 21-1, PageID# 399, Ozan Depo. Tr. at 118-119).

Plaintiff was interviewed by Patton and Armata as part of the investigation. (R. 22-1, PageID# 627, Patton Depo. Tr. at 19; R. 23-1, PageID# 681, Armata Depo. Tr. at 21-22). Patton testified that, during his interview of Plaintiff, Plaintiff admitted to the practice of signing on behalf of customers even without their permission to try and get a commitment from the customer. (R. 22-1, PageID# 628, Patton Depo. Tr. at 22-23). According to Patton, Plaintiff also volunteered that if a customer with multiple locations agreed to use Toast at only one, she would nevertheless record the sale as to all the other locations too. *Id*. at Tr. 24-25. Patton further testified that Plaintiff admitted to inputting fabricated customer email addresses into the software system. *Id*. at Tr. 27.

Patton stated that the investigation substantiated wrongdoing by Plaintiff, namely that: "she signed documents representing that she had permission from customers, when she did not have

their permission; that she represented sales that had actually not happened -- … [a]nd that she used e-mails that were not accurate, in order to accomplish the signing of these deals." (R. 22-1, PageID# 627, Patton Depo. Tr. at 20). Patton "recommended termination, because that behavior was a violation of our code of conduct's honest and accurate reporting." *Id*. at Tr. 34. Thereafter, Toast terminated Plaintiff's employment. *Id*. at Tr. 35.

**III. Summary Judgment Standard**

Summary judgment is appropriate only if the moving party demonstrates there is no genuine dispute of material fact on an issue that would entitle the movant to judgment as a matter of law. Fed.R.Civ.P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the non-movant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is only genuine, however, if a reasonable jury could resolve the dispute and return a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

## IV. Law and Analysis

### A. Count One: Disability Discrimination Under Federal and Ohio Law[8]

Title I of the ADA provides that a covered employer "shall [not] discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *Whitfield v. Tennessee*, 639 F.3d 253, 258 (6th Cir. 2011) (quoting 42 U.S.C. § 12112(a)). "To survive summary judgment, [a plaintiff asserting a disability discrimination claim] must, at the very least, make out a prima facie case of discrimination." *Messenheimer v. Coastal Pet Prods., Inc.*, 764 Fed. App'x 517, 518–19 (6th Cir. 2019) (citing *E.E.O.C. v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)).

The *McDonnell Douglas* burden-shifting test applies where a plaintiff seeks to establish disability discrimination under the ADA through circumstantial evidence. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008). Here, Plaintiff has not presented direct evidence of disability discrimination. "To state a prima facie case of disability discrimination, a plaintiff must show that (1) he is disabled or his employer regarded him as disabled, (2) he is otherwise qualified to perform the essential functions of a position, with or without accommodation, and (3) he suffered an adverse employment action because of his disability." *Wallace v. Edward W. Sparrow Hosp. Ass'n*, 782 Fed. App'x 395, 404 (6th Cir. 2019) (*citing Demyanovich v. Cadon*

[8] The elements of a disability retaliation claim under the ADA and Ohio law are largely the same as under Title VII. *See, e.g., Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014); *Green v. Bakemark USA, LLC*, No. 1:13-CV-841, 2016 WL 258345, at *15 (S.D. Ohio Jan. 20, 2016) (noting that plaintiff's disability retaliation claim was pleaded under Ohio law, but that "state courts may look to federal case law regarding cases involving alleged retaliation"), *aff'd*, 683 F. App'x 486 (6th Cir. 2017).

*Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014)). “The plaintiff must prove that his disability was the ‘but-for’ cause of his termination.” *Id*. at 404 (*citing Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc)); *accord Pemberton v. Bell's Brewery, Inc.*, 150 F.4th 751, 767 (6th Cir. 2025), *cert. denied*, No. 25-6798, 2026 WL 1640855 (U.S. June 8, 2026).

> Should the plaintiff establish a prima facie case of discrimination, the employer must “articulate some legitimate, non[-]discriminatory reason” for its action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Ferrari*, 826 F.3d at 892. If the defendant meets this burden of production, the plaintiff must introduce evidence showing “that the proffered reason was not the true reason for the employment decision.” *St. Mary’s Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (quoting *Tex. Dep’t of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Under this scheme, the ultimate burden of persuasion remains at all times with the plaintiff. *Hicks*, 509 U.S. at 507, 113 S.Ct. 2742.

*Barlia v. MWI Veterinary Supply, Inc.*, 721 F. App'x 439, 445 (6th Cir. 2018).

Defendant argues that it is entitled to summary judgment on Plaintiff’s disability discrimination claim because: (1) there is no evidence Plaintiff was disabled, and, even if she was, no one at Toast knew or had reason to know that Plaintiff was disabled; (2) Plaintiff did not have any work restrictions and she never submitted medical documentation indicating any limitations—all while continuing to working without issue after the accident; and, (3) there is no evidence that Defendant terminated Plaintiff because of a disability, as opposed to its good-faith belief that Plaintiff’s reporting and sales practices violated the company’s code of conduct. (R. 18, PageID# 98).

Plaintiff maintains she has satisfied all four elements of a prima facie discrimination claim, and further asserts that there is evidence from which a jury could reasonably conclude that the stated reason for Plaintiff’s termination was pretextual. (R. 24, PageID# 728-734).

**1. Step One: Evidence of Disability**

As stated above, to establish a prima facie disability discrimination claim based upon unlawful termination, a plaintiff must, as a threshold matter, show she was disabled. Plaintiff contends that she is disabled for the purposes of the ADA, because she has a "a physical or mental impairment that substantially limits one or more of the major life activities of [the affected] individual." (R. 24, PageID# 729, citing 42 U.S.C. § 12102(2)(A)).

First, Plaintiff points to her own deposition testimony that since her accident, she has "struggle[d] to get in and out of cars, sit in seats for a period of time, to walk up and down stairs." (R. 24, PageID# 728, *citing* R 21-1, PageID# 403, Ozan Depo. Tr. at 137). Plaintiff also points to her own testimony that she can no longer weight train at the gym. *Id*. Finally, Plaintiff cites her own testimony that she cannot clean her house since the accident. *Id*. at PageID# 729, citing Ozan Depo. Tr. at 92.[9]

Defendant counters that despite discovery, Plaintiff has not produced any medical records during discovery to substantiate these alleged diagnoses, relying solely on her own self-serving assertions unsupported by any objective medical evidence. (R. 25, PageID# 737, n. 1). Furthermore, Defendant relies on Plaintiff's continued ability to perform her job for several months after the accident without apparent issue, as well as Plaintiff's admission that she never

[9] Without citing any evidence of record, Plaintiff asserts that the ability to get in and out of a motor vehicle was a requisite for her position, as was the ability to sit for long periods of time and the ability to walk up and down stairs. (R. 24, PageID# 729). The second prong of the *McDonell Douglas* test requires a plaintiff to show she is otherwise qualified to perform the essential functions of a position *with or without accommodation*. To the extent Plaintiff is suggesting that her medical impairments prevented her from performing the essential functions of her position, her claim would fail. If she cannot perform the essential functions of her position without accommodation, she would have to offer evidence that a reasonable accommodation would enable her to get in and out of a motor vehicle or to walk up and down stairs.

provided any work restrictions to Toast from any medical provider, as evidence that she was not disabled. (R. 18, PageID# 98-99; R. 25, PageID# 737). Plaintiff indeed has admitted that "I did not provide work restrictions to Toast, no." (R. 21-1, PageID# 391, Ozan Depo. Tr. at 87). Plaintiff has also admitted to going on a four-day hiking trip in Washington a month after her accident. *Id*. at Tr. 112.

> The term "disability" means, with respect to an individual-
>
> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.
>
> 42 U.S.C. § 12102(2). Ohio's definition is substantially similar. Ohio Rev. Code § 4112.01(A)(13). "Major life activities" are "those activities that are of central importance to daily life." *Toyota Motor Mfg., Ky. v. Williams*, 534 U.S. 184, 198, 122 S.Ct. 681, 691, 151 L.Ed.2d 615 (2002). "It is insufficient for individuals attempting to prove disability ... to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those 'claiming the Act's protection ... to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience ... is substantial.' " *Id*. at 198, 122 S.Ct. 681.

*Gardull v. Perstorp Polyols, Inc.*, 382 F. Supp. 2d 960, 964 (N.D. Ohio 2005) (Katz, J.)

According to another district court, "the determination of whether a plaintiff has an impairment that substantially limits one or more of that individual's major life activities, is a threestep process involving questions of law for the Court." *White v. Interstate Distrib. Co.*, No. 3:09-CV-01059, 2010 WL 5300872, at *9 (M.D. Tenn. Dec. 17, 2010) (citing B*ragdon v. Abbott*, 524 U.S. 624, 631 (1998)), *aff'd,* 438 F. App'x 415 (6th Cir. 2011).

> First, the Court must decide whether the plaintiff has an impairment. Second, the life activity upon which the plaintiff relies must be identified, and then the Court must determine whether that life activity constitutes a major life activity under the ADA. Third, the Court must tie the two statutory phrases together asking

"whether the impairment substantially limited the major life activity."

*Id*. (citations omitted).

The Court finds that Plaintiff has failed to present sufficient evidence from which it could conclude that Plaintiff's diagnoses, assuming *arguendo* that they indeed exist, result in an impairment that substantially limits one or more major life activities. "Although medical testimony is not always necessary to show that an impairment substantially limits an employee's ability to work … the Plaintiff must offer some admissible evidence that he is 'disabled' as that term is defined in the ADA." *Smith v. Waffle House, Inc.*, No. 3-11-0468, 2012 WL 2344625, at *2 (M.D. Tenn. June 20, 2012). As the *Smith* court aptly stated, "Plaintiff's own conclusory statements are insufficient." *Id*. (finding Plaintiff failed to present sufficient evidence regarding the extent of his alleged disability or his bending limitations). Further, a medical diagnosis alone is insufficient to demonstrate disability under the ADA where the impairment is one whose symptoms can vary widely between individuals. *See, e.g., Falor v. Livingston Cnty. Cmty. Mental Health*, No. 5:02-CV-60, 2003 WL 21684183, at *4 (W.D. Mich. May 30, 2003); *Dale v. McDonough*, No. 1:22-CV-10815, 2024 WL 1662904, at *8 (E.D. Mich. Feb. 28, 2024), *report and recommendation adopted*, 2024 WL 1660525 (E.D. Mich. Apr. 17, 2024); *McDaniel v. Wilkie*, No. 17CV91, 2019 WL 626547, at *4 (N.D. Ohio Feb. 14, 2019), *aff'd*, 2020 WL 1066007 (6th Cir. Jan. 31, 2020).

Plaintiff herein has not sufficiently shown that her alleged diagnoses constituted disabilities within the meaning of the ADA. Assuming the validity of the diagnoses, Plaintiff has failed to present evidence indicating that "one or more major life activity" was substantially limited as a result of these conditions. Even if the Court were to construe the issue as one of fact reserved for a jury, the Court would find no genuine issue of fact remains. The uncontroverted testimony that

Plaintiff performed her job for many months after her accident, was able to go for a several day hiking trip, and go exercise at the gym (albeit not lift weights) all undermine the vague assertion that she "struggle[d] to get in and out of cars, sit in seats for a period of time, to walk up and down stairs." (R 21-1, PageID# 403, Ozan Depo. Tr. at 137). No reasonable juror could find that Plaintiff was disabled on the facts presented.

Finally, Plaintiff points to no evidence and presents no argument that she was being regarded as having a disabling impairment. Thus, Plaintiff has failed to present evidence capable of satisfying the first step of a prima facie case, and the Court's analysis could end here. Nevertheless, even assuming *arguendo* that she is disabled, Defendant's motion for summary judgment would still succeed.

**2. Legitimate, Non-discriminatory Reason for Termination**

Assuming for the sake of argument only that Plaintiff established a prima facie case, the burden shifts to Defendant to show a legitimate, nondiscriminatory reason for the adverse employment action. *Wallace*, 782 F. App'x at 404 (c*iting Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008)).

Defendant argues in its motion that it has "proven a legitimate, nondiscriminatory reason for her termination," specifically Plaintiff's failure to abide by Toast's code of conduct by failing to accurately and honestly report business transactions. (R. 18, PageID# 99). As recounted in the Facts section *supra*, Toast conducted an investigation and concluded that Plaintiff falsified records by falsely stating that certain customers agreed to purchase Toast's software for multiple locations and/or falsely stated that said customers authorized her to sign an agreement on their behalf.

Defendant avers that its decision to terminate Plaintiff was based on its factual

determination that Plaintiff violated its code of conduct. (R. 18, PageID# 100). Defendant further argues that even if Plaintiff were to argue that she did not falsify any business records, it is entitled to summary judgment based on the "honest-belief" doctrine. *Id*.

To quickly summarize the facts set forth above, in March of 2023, over seven months after Plaintiff's accident, Defendant initiated an investigation into Plaintiff's conduct after it received an anonymous report as well as a complaint from a peer employee of Plaintiff. According to Schidlovsky's testimony, Plaintiff had sold the Toast system to Chicken Ranch for one of its locations but had recorded in Defendant's software that the customer had agreed to purchase Toast software for two additional locations, causing the customer to become upset. This testimony is corroborated by an email from the customer. (R. 18-2, PageID# 245, Exh. E).

Two individuals with Toast who were unfamiliar with Plaintiff's injury/accident initiated an investigation that included pulling data concerning Plaintiff's customer signings. (R. 23-1, PageID# 680, Armata Depo. Tr. at 16-17). Plaintiff utilized an "in-person signing" process to sign-up customers that had been phased out—the timing of the phase out is disputed by Plaintiff. Two customers, one with multiple locations, confirmed that they had not executed the agreements, and did not intend to sign deals with Toast for more than one location. (R. 23-1, PageID# 680, Armata Depo. Tr. at 17-20; R. 20-1, PageID# 325, Schidlovsky Depo. Tr. at 33). Data from Defendant's review of its Salesforce software showed that several variations of incorrect email addresses were entered by Plaintiff for deals with the two affected customers, which would cause those customers not to receive the auto-generated emails confirming the agreements. (R. 19-1, PageID# 262, Winick Depo. Tr. at 30-33; R. 19-1, PageID# 294, Exh. 4 of Winick Depo; R. 22-1, PageID# 629, Patton Depo. Tr. at 27). Patton testified that Ozan admitted to inputting incorrect e-mails, in order to avoid those processes. (R. 22-1, PageID# 629, Patton

Depo. Tr. at 27). Patton further testified that Ozan admitted to the following: signing on behalf of customers, even without their permission, to try and get a commitment from the customer; signing a customer up for multiple locations even if they only agreed to one; and inputting fabricated customer email addresses into the software system. (R. 22-1, PageID# 628, Patton Depo. Tr. at 20, 22-25, 27). Patton "recommended termination, because that behavior was a violation of our code of conduct's honest and accurate reporting" and Plaintiff was subsequently terminated. (R. 22-1, PageID# 627, Patton Depo. Tr. at 20, 34-35).

The Court finds that based on this evidence of record, Defendant has satisfied its burden of showing a legitimate, nondiscriminatory reason for Plaintiff's termination. Thus, the burden now shifts back to Plaintiff to show by a preponderance of the evidence that Defendant's proffered reason was merely a pretext for discrimination. *Wallace*, 782 F. App'x at 404. "To establish pretext, the plaintiff is required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that the proffered reasons were insufficient to motivate discharge." *Id.* (*citing Coomer v. Bethesda Hospital, Inc.*, 370 F.3d 499, 511 (6th Cir. 2004)). In analyzing pretext, the Sixth Circuit "has employed a version of the 'honest belief' rule...The formulation used provides that as long as the employer honestly believed the reason it gave for its employment action, an employee is not able to establish pretext even if the employer's reason is ultimately found to be mistaken. [T]o prove that the offered, non-discriminatory basis for the employment action is 'honestly held,' the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Reams v. Loc. 18, Int'l Union of Operating Eng'rs*, No. 3:21 CV 878, 2023 WL 2185971, at *9 (N.D. Ohio Feb. 23, 2023) (citations omitted), *aff'd sub nom. Reams v. Int'l Union of Operating Eng'rs, Loc. 18*, No.

23-3242, 2023 WL 8716978 (6th Cir. Dec. 18, 2023).[10]

The Court need not decide on the applicability of the "honest belief rule," as there is simply no evidence of record that "[the employer's] conclusion is later shown to be mistaken, foolish, trivial, or baseless." *Anderson v. Hamilton Cty. Bd. of Comm'rs*, No. 1:13-cv-755, 2018 U.S. Dist. LEXIS 113948, at *54 (S.D. Ohio July 10, 2018) (*quoting Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 591 (6th Cir. 2014)). Nevertheless, assuming purely for the sake of argument that some facts exist in the record that could call into question whether Plaintiff's conduct violated Toast's code of conduct, the Court cannot find that Defendant acted unreasonably by relying on the facts that were before it after the completion of its investigation and at the time the decision was made to terminate Plaintiff.

To the extent Plaintiff is revoking the admission she purportedly made to Patton during her interview, she still must present some evidence before the Court could find Defendant's proffered reason pretextual. "[A]n employee's bare assertion that the employer's proffered reason has no basis in fact is insufficient to call an employer's honest belief into question, and fails to create a genuine dispute of fact[.]" *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 322 (6th Cir. 2019) (noting that to overcome the "honest belief rule" an employee must point to evidence that "the employer failed to make a reasonably informed and considered

[10] "Under the honest belief rule, an employer's proffered reason is considered honestly held where the employer can establish it 'reasonably reli[ed] on particularized facts that were before it at the time the decision was made'" *Harris v. Pentair Flow Techs*., LLC, No. 1:19-cv-2180, 2021 U.S. Dist. LEXIS 154276, *20 (N.D. Ohio Aug. 17, 2021) (*quoting Smith v. Chrysler Corp*., 155 F.3d 799, 806 (6th Cir. 1994)). "To overcome the employer's invocation of the honest belief rule, the employee 'must allege more than a dispute over the facts upon which [the] discharge was based. He must put forth evidence which demonstrates that the employer did not honestly believe in the proffered non-discriminatory reason for its adverse employment action.'" *Id*.

decision before taking its adverse employment action").

Plaintiff's opposition brief makes blanket conclusory statements that her direct supervisor Winick, had a discriminatory animus towards her, that he manipulated her termination under a Cat's Paw Theory, and that he did not direct her to stop utilizing the in-person signing technique until the eve of the investigation into her conduct. (R. 24, PageID# 730-732). Plaintiff's argument is rife with speculation but short of evidentiary support. A plaintiff's argument that an investigation is a sham, without more, "does not provide adequate support for her argument that the honest belief doctrine could not be applied…." *Crossley v. Kettering Adventist Healthcare,* No. 23-3346, 2024 WL 338163, at *8 (6th Cir. Jan. 30, 2024). Plaintiff's brief points to her own testimony that account executives were "taught that we could collect all the information from the customer, for example, Social Security numbers and bank account information and all of this, and we could complete the documents on behalf of the customer, **if you have the customer's approval**. And we had done this for years and years." (R. 24, PageID# 731, citing R. 21-1, PageID# 393, Ozan Depo. Tr. at 95) (emphasis added).

First, Plaintiff has pointed to no evidence that Defendant's conclusion—that Plaintiff falsely signed agreements on customers' behalf without their authorization—was incorrect or mistaken. As Defendant points out, Plaintiff's position—that the in-person signing phase out had not gone into effect—is immaterial. (R. 25, PageID# 720). As the bold language above from Plaintiff's brief illustrates, even she acknowledges that *customer approval was necessary* before she could sign on their behalf. Defendant avers that "the in-person signing procedure was never a license to forge signatures." (R. 25, PageID# 740). Schidlovsky testified that "the only reasons for Michelle Ozan's termination were these agreements that were executed and counted without authorization." (R. 22-1, PageID# 323, Schidlovsky Depo. Tr. at 25). Patton testified that, as a

result of her interview with Plaintiff, it was determined that "[Ozan] signed documents representing that she had permission from customers, when she did not have their permission; that she represented sales that had actually not happened." (R. 22-1, PageID# 627, Patton Depo. Tr. at 20-21). The lack of authorization was corroborated by an email from an actual customer. (R. 18-2, PageID# 245, Exh. E).

Finally, although not material to the Court's determination, Plaintiff's entire premise—that in-person signing was not phased out until after her termination—is wholly undermined by her own message months earlier to Winick complaining that "[w]ish in-person signing didn't go out. Chasing DocuSigns again might cripple me. If you think of a workaround outside of having them forwarded to me, please let me know." (R. 21-1, PageID# 399, Ozan Depo. Tr. at 118; Exh. 16 to Ozan Depo. at PageID# 525).

In sum, Defendant has satisfied it burden of showing a legitimate, nondiscriminatory reason for Plaintiff's termination—signing agreements on behalf of customers without their consent. Plaintiff has failed point to evidence that this proffered reason had no basis in fact, that the proffered reason did not actually motivate the discharge, or that the proffered reason was insufficient to motivate her discharge. Therefore, Defendant's motion for summary judgment is well-taken.

## V. Conclusion

For the foregoing reasons, the Defendants' Motion for Summary Judgment (R. 18) is hereby GRANTED. Therefore, this matter is hereby dismissed with prejudice.

IT IS SO ORDERED.

s/ *David A. Ruiz*
David A. Ruiz
United States District Judge

Date: September 1, 2026